IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| Vanessa Slade and Kelvin Thomas, | § § § | |
| Plaintiffs, | § § | |
| vs. | § § | Civil Action No. |
| Utility Trailer Manufacturing Company, | § § | |
| Defendant. | § § | |

**PLAINTIFFS' COMPLAINT**

**To the Honorable Judge of Said Court:**

COME NOW, Vanessa Slade and Kelvin Thomas (hereinafter referred to as "Plaintiffs"), and under TEX. CIV. PRAC. & REM. CODE §§ 71.001, *et seq.*, respectfully file this Complaint against Utility Trailer Manufacturing Company (hereinafter referred to as "Utility Trailer"), and in support hereof would state and show the following:

**I. Parties**

1. Plaintiff Vanessa Slade is the biological mother of Decedent, Angienecka Harris.

2. Plaintiff Kelvin Thomas is the biological father of Decedent, Angienecka Harris.

3. Defendant, Utility Trailer Manufacturing Company is a California corporation with its principal place of business in City of Industry, California 91748. Service

of process upon this Defendant may be had by serving its registered agent for service at: Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620 Austin, Texas 78701-4234.

## II. Jurisdiction

4. This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. § 1332.

5. The parties to this lawsuit are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6. Utility Trailer's products are distributed throughout North America, including the United States, and including Texas.

7. Utility Trailer was founded in 1914 by two brothers whose emphasis was on designing and building trailers based on new materials and innovative technology. Utility Trailer is America's oldest privately owned, global designer, manufacturer, and seller of trailers. Utility Trailer's other products include dry freight vans, flatbeds, refrigerated vans, Tautliner curtain-sided trailers, and aero-technologies.

8. By 1927, Utility Trailer trailers were being used by some of America's top corporations including Pacific Telephone & Telegraph, Sunkist and Union Oil.

9. By 1944, Utility Trailer was the first manufacturer to establish sales and service centers in every state west of the Continental Divide.

10. In the 1960's, with the Federal Highway Interstate System in effect, there were more Utility Trailer trailers on the road than ever before.

11. In the 1970's, Utility Trailer had a nationwide, full-service dealer network in place, and the company ranked among the top seven trailer producers.

12. In the 1981, Utility Trailer introduced the Tautliner to the U.S.; the world's foremost patented curtain-sided convertible van to flatbed system. Its unique dual-function design combined the strength and weather protection of a van with the easy and quick-loading advantages of a flatbed. A year later, the company added the Tautliner Truck body.

13. In 1986, Utility Trailer introduced its 2000R, and due to its state-of-the-art design, it was America's top-selling reefer. Utility's track record as industry leader and innovator made the company North America's #1 manufacturer of refrigerated trailers.

14. In the 1990's, Utility Trailer designed and began selling a new line of multi-temp refrigerated trailers with a center wall and interlocking bulkhead systems, called the CenterSeal, which allowed fresh, frozen, dry products to be hauled simultaneously. The company also adopted a new corporate identity with a new logo and a marketing strategy aimed at making Utility Trailer an international company.

15. In the 2000's, Utility Trailer began selling its innovative 3000R, which was the best-selling reefer in the industry. Utility Trailer also designed and sold the 4000D-X Dry Freight Van, which was the first to be EPA SmartWay Certified. Next, Utility Trailer integrated its 3000R advanced foaming technology into its dry van to introduce the new 4000D Composite trailer, making it the lightest, most productive

composite dry van available. Utility Trailer also introduced a totally redesigned 4000A light-weight flatbed.

16. From 2010 through 2014, Utility Trailer continued to experience significant growth, maintaining its leadership position in the trailer industry. Utility Trailer made 100% LED lighting standard on all of its trailers. In 2011, Utility Trailer introduced the innovative Adjustable Load Securement System, and the next generation EPA SmartWay verified Advanced Side Skirt, the USS120A-4. During this time, Utility's 3000R continued to remain the preeminent and number one selling refrigerated trailer, while the 4000D-X Composite became the fastest growing trailer in the company's history.

17. Utility Trailer currently operates six trailer manufacturing facilities across North America. Utility's 3000R and the 3000R multi-temp refrigerated trailers are manufactured at the Marion, Virginia, Clearfield, Utah and Piedras Negras, Mexico plants. The 4000D-X Composite series and 4000D dry vans are manufactured at the Glade Spring, Virginia and Paragould, Arkansas plants. The 4000AE, 4000S and 4000AE Drop Deck flatbeds as well as the Tautliner are all manufactured at the Enterprise, Alabama facility.

18. Utility Trailer has been conducting business in Texas since 1950 when it built its first regional manufacturing plant in El Paso, Texas. At that time, Utility Trailer Manufacturing Company conducted business in Texas under the name Utility Trailer

Sales Company, which later changed to Utility Trailer Company as reflected by Utility Trailer Company's registration to transact business in Texas that was filed with the Texas Secretary of State on August 1, 1960.

19. According to the Texas Secretary of State's records, on or about December 31, 1987, there was a merger of Utility Trailer Company and Utility Trailer Manufacturing Company with Utility Trailer Manufacturing Company being the surviving entity. Since that time, Utility Trailer Manufacturing Company has been registered with the Texas Secretary of State to transact business in Texas, under the name Utility Trailer Manufacturing Company as well as under the assumed name of Utility Trailer Company.

20. Based on Utility Trailer Manufacturing Company's Texas Franchise Tax Public Information Report for year 2001, Utility Trailer Manufacturing Company held interests in two other Texas companies transacting business in Texas: 49% interest in Utility Trailer of Dallas, Inc. and 48% interest in Utility Trailer Southwest Sales Company.

21. On April 13, 2010, Utility Trailer Manufacturing Company renewed its registration to transact business in Texas with the Texas Secretary of State.

22. On or about June 28, 2010, Utility Trailer of Dallas, Inc. notified the Texas Secretary of State that Utility Trailer of Dallas, Inc. consents and gives permission to Utility Trailer Manufacturing Company to use the name Utility Trailer Manufacturing Company in Texas.

Plaintiffs' Complaint
Page 5 of 18

23. On December 1, 2017, a merger occurred between two Texas companies: Utility Trailer Southwest Sales Company and Utility Trailer Sales Southeast Texas, Inc., with Utility Trailer Southeast Texas, Inc. as the surviving entity. Utility Trailer Manufacturing Company holds a 49 % interest in Utility Trailer Southeast Company.

24. On or about October 18, 2016, Utility Manufacturing Company purchased three, undeveloped properties in Eagle Pass, Texas. On that same day, Utility Trailer Southeast Company purchased two, undeveloped properties in Eagle Pass, Texas. These properties would soon be developed and become a new, combined-use facility by Utility Trailer Manufacturing Company and Utility Trailer Southeast Company.

25. According to a press-release in March 2019, Utility Trailer Manufacturing Company announced the opening of its new, dual-use facility located on historic Route 57 in the city of Eagle Pass, Texas. The facility is situated on 40 acres of land, ideally located to service the Utility Trailer refrigerated trailer factory in Piedras Negras, Mexico, just three miles down the road. According to Steve Bennet, Vice President of Utility Trailer Manufacturing Company, "this strategic location is an ideal setting to store new trailers and get them ready for pick-up . . . in the near future it will become a center for transportation, receiving and accounting management," and "it will also be the receiving point for customer furnished materials and other production materials." There is also a 51,000 square foot parts warehouse and a 20-bay full-service facility operated by Utility Trailer Sales Southeast Texas, Inc., offering new and used trailers, parts, and service.

26. According to the March 2019 press-release, Utility Trailer Manufacturing Company has a 130-acre parcel under development, for new trailer parking and warehouse operations, to support the Utility Trailer factory that is located just three miles down in Piedras Negras, Mexico. As of March 2019, the first phase of the parking facility was already open for new trailer pick-up. The new Texas address for Utility Trailer Manufacturing Company is 5395 U.S. Highway 57, Eagle Pass, Texas 78852.

27. Utility Trailer is registered to do business in the state of Texas, maintains a registered agent for service of process in Texas (and has for decades), is authorized to conduct business in Texas, conducts significant business in Texas, and derives significant revenue in the millions of dollars from its activities in Texas.

28. Utility Trailer has insured risks located in Texas. Utility Trailer has paid millions of dollars in taxes to Texas. Utility Trailer has owned and/or owns substantial property in Texas.

29. Employees, officers and/or directors of Utility Trailer have visited, lived, conducted business, and/or worked in Texas. There has never been a time in the past 80 years where Utility Trailer did not sell, distribute, or market its trailers in Texas.

30. Utility Trailer has a national dealership network which includes many dealerships in Texas who market and sell new Utility Trailer products, service Utility Trailer products, honor Utility Trailer warranties, and carry-out necessary trailer recall work which Utility Trailer requires.

31. A large segment of Utility Trailer's gross income for sales, services and repair work is derived from the activities of its dealership network in Texas.

32. Utility Trailer also monitors its trailers, such as looking at customer complaints or feedback from distributors and dealers, including many in Texas.

33. Utility Trailer keeps records of how many trailers are shipped to each state, and how much revenue is generated from each state, including Texas.

34. Utility Trailer maintains multiple offices in the State of Texas.

35. Utility Trailer has subsidiaries and business affiliates in the State of Texas.

36. Utility Trailer has employees and agents in the State of Texas.

37. Utility Trailer keeps records of the revenue that it derives from the State of Texas.

38. Numerous corporate representatives, agents, and/or employees have visited the State of Texas for business purposes on occasions too numerous to list.

39. Utility Trailer's subsidiaries are registered to do business in Texas and have a registered agent for service of legal process in Texas.

40. Utility Trailer designs, manufactures, tests, assembles, sells, distributes, and places Utility Trailer model trailers and their component parts into the stream of commerce, such as the Utility Trailer (VIN-1UYVS2533AM896109) ("Subject Trailer") involved in the incident made the basis of this suit. Thousands of trailer models have been provided by Utility Trailer directly to Utility Trailer dealerships in Texas and to Utility Trailer consumers. The Subject Trailer model has been marketed directly to Texas consumers.

41. Advertisements and marketing materials were and are targeted to Texas residents to entice them to purchase Utility Trailer trailers and Utility Trailer services, including the Subject Trailer model.

42. Utility Trailer has spent millions upon millions of dollars advertising and marketing in Texas and directly to Texas residents for years, whether in the form of television advertisements, magazine advertisements, newspaper advertisements, internet advertisements, or other forms of advertising and/or marketing.

43. Given that Utility Trailer has been in business since 1914, and its primary goal has been to be the #1 manufacturer and seller of trailers in the U.S. market, Utility Trailer knew or should have known that a Utility Trailer trailer could reach or enter Texas.

44. Utility Trailer knew or should have known that if one of its trailers was defectively designed, manufactured, marketed, or sold - this defective trailer could reach or enter Texas and injure a person or persons in Texas.

45. Utility Trailer has a regular plan for the distribution of its new and used products within Texas with the goal of achieving a commercial benefit from the sale of those products in Texas.

46. Utility Trailer places its products into the stream of commerce by targeting Texas through nine (9) Utility Trailer dealerships in Texas.

47. Utility Trailer holds patents and trademarks which it demands must be honored in Texas.

48. Utility Trailer further manufactures its products and its trailers to comply with United States standards, including the Federal Motor Vehicle Safety Standards (FMVSS), and it routinely corresponds and works with the National Highway Traffic Safety Administration (NHTSA) on recalls and other issues, including recalls or fixes to problems for trailers owned and used by Texas residents.

49. Utility Trailer is personally subject to specific jurisdiction in this Court because Utility Trailer is subject to the Texas long-arm statute by doing business in Texas and by contracting with Texas residents and by performing such contracts in part in Texas and by committing torts where one or more elements of the tort or one or more of the tortious acts occurred in Texas and by recruiting Texas residents for employment.

50. Also, the claims against Utility Trailer in this case are linked to Utility Trailer's conduct.

51. Utility Trailer placed the Subject Trailer into the stream of commerce where it ultimately ended up in Texas;

52. The key elements of the episode-in-suit occurred in Texas.

53. Utility Trailer has purposefully availed itself in Texas, because Utility Trailer's contacts with Texas principally relate to the sale of trailers and all of the conduct associated with such trailer sales and this civil action is related to and connected with the sale of a trailer, because due process and fair play and substantial justice are honored by this civil action going forward in this Texas Court.

54. There is little or no burden on Utility Trailer litigating this case in this Texas Court. In contrast, it would be a tremendous burden and great inefficiency and unnecessary delay imposed on the Plaintiffs to litigate this case in another forum because Texas has an interest in overseeing this litigation which involves injuries to Texas residents and defective products used in Texas.

55. The efficient resolution of this civil action can only go forward in this Texas, and public policy favors resolution of this dispute in this Texas Court.

56. Utility Trailer cannot deny personal jurisdiction because Utility Trailer placed the Subject Trailer into the stream of commerce under circumstances such that Utility Trailer should reasonably anticipate being haled into court in Texas.

57. In short, Utility Trailer is in the business of the manufacture of trailers, including the trailer which caused the injuries complained of herein. It also derives substantial profit from the state of Texas. Utility Trailer, in no way, shape, or form, ever restricted the trailer which caused the serious injuries from being distributed, sold, or used in Texas. Utility Trailer has purposefully availed itself of the privilege and benefits of conducting activities within Texas.

58. Accordingly, Utility Trailer is therefore subject to be sued in Texas courts, and exercise of personal jurisdiction pursuant to Texas's long arm statute is, among other things, consistent with due process because Defendant has purposefully availed itself of the privilege of doing business in the forum.

### III. Facts

59. On or about December 13, 2021, Angienecka Harris was the driver of a 2005 Chevrolet Silverado C1500 traveling westbound on IH-20 in Harrison County, Texas.

60. A tractor-trailer slowed down in front of Angienecka Harris' vehicle causing her vehicle to strike the rear of the tractor-trailer.

61. The strike caused Angienecka Harris' vehicle to experience an underride event.

62. At the time of the accident, Angienecka Harris was properly seated and properly wearing the available seatbelt.

63. However, despite being properly seated and properly wearing the available seatbelt, Angienecka Harris sustained fatal injuries due to the underride of her vehicle vis-à-vis the trailer[1].

64. The Subject Trailer was designed by Defendant Utility Trailer.

65. The Subject Trailer was manufactured by Defendant Utility Trailer.

66. The Subject Trailer was assembled by Defendant Utility Trailer.

67. The Subject Trailer was also tested by Defendant Utility Trailer.

## IV. Cause(s) of Action as to Defendant Utility Trailer Manufacturing Company

*A. Count One: Strict Liability and Defective Design/Manufacture/Failure to Warn*

---

[1] In any automobile accident case, the distinction between the cause of an accident versus the cause of injuries is an important one. One of the best analogies is the case of the Titanic. While the cause of hitting the iceberg has been the subject of much debate (inattentiveness, the captain may have been drinking, they were going too fast, etc.), there is no question that every passenger who entered a lifeboat that night lived, while 99% of those who went in the water died. Accordingly, had the Titanic had enough lifeboats on board (i.e., the boat's "safety systems"), 100% of the people on-board would probably have survived. So, the cause of the sinking (the accident) is irrelevant vis-à-vis how everyone died. What's important is how the safety systems worked (or didn't work) following the accident.

68. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

69. It was entirely foreseeable to and well-known by Utility Trailer (hereinafter referred to in this Section simply as "Defendant") that accidents and incidents involving the Subject Trailer, such as occurred herein, would on occasion take place during the normal and ordinary use of the Subject Trailer.

70. The fatal injuries to Angienecka Harris, complained of herein, occurred because the Subject Trailer was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents.

71. The Subject Trailer in question was unreasonably dangerous and defectively designed and Defendant was negligent in its engineering analysis and testing in the following ways:

   a. Defendant used a weak two (2) post design rather than a robust two (2) post design;
   b. Defendant failed to use a four (4) post design;
   c. The rear underride guard failed to absorb energy;
   d. The rear underride guard failed to prevent vehicle underride;
   e. The rear underride guard's failure destroyed the crashworthiness capabilities of the striking vehicle;
   f. The rear underride guard rendered the safety systems on the striking vehicle ineffective;
   g. The rear underride guard violated FMVSS;
   h. The rear underride guard violated NTSB recommended practices;
   i. The rear underride guard violated industry practices;
   j. The Subject Trailer was equipped with a weak and inadequate underride guard when impacted in a narrow frontal offset impact;
   k. Defendant failed to utilize design countermeasures for the rear underride guard to address narrow frontal offset impacts;

l. The trailer industry was on notice that narrow frontal offset impacts of rear underride guards would cause the guard to fail;

m. Defendant failed to utilize designs that would prevent vehicles from underriding the rear guard when the guard was struck offset;

n. Defendant failed to utilize material that would prevent vehicles from underriding the rear guard when the guard was struck offset;

o. Defendant failed to utilize UHSS, AHSS, EHSS, boron, ferrite, martensite, complex phase, dual phase and/or TRIP type steel in the design and manufacture of the read underride guard;

p. The Subject Trailer underride guard was not subjected to frontal offset type crash;

q. The Subject Trailer underride guard was not subjected to frontal offset type pendulum, ram or dynamic type testing;

r. The Subject Trailer underride guard was not designed using FEM, finite element modeling, LSDYNA, MADYMO or any other computerized accident simulation software;

s. The Subject Trailer underride guard was not designed using FEM, finite element modeling, LSDYNA, MADYMO or any other computerized design software;

t. The Subject Trailer underride guard was not designed using FEM, finite element modeling, LSDYNA, MADYMO or any other computerized material software;

u. The Subject Trailer underride guard was not subjected to rigorous engineering analysis such as DFMA, FMEA, failure mode effects analysis, fault tree analysis or risk hazard analysis;

v. Defendant failed to follow the National Safety Council safety hierarchy or engineering triad in the design and manufacture of the rear underride guard;

w. Defendant failed to identify potential risks, hazards and dangers associated with impacts involving narrow or moderate underride guard impacts;

x. The Subject Trailer guard violated the purpose of an underride guard;

y. The Subject Trailer guard violated applicable principles of trailer crashworthiness; and/or

z. The defects and negligence were the producing, direct, substantial and proximate cause of the fatal injuries and damages.

### B. Count Two: Negligence

72. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

73. Defendant was further negligent in failing to conduct any engineering analysis whatsoever as it relates to the societal benefits, safety benefits, or economic benefits associated with the use of adequate rear underride guards.

74. Defendant further failed to conduct proper testing and engineering analysis during the design, development, and testing of the rear underride guard.

75. Most (if not all) engineering associates in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public."

76. Accordingly, since paramount means "superior to all others," all engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design products, such as trailers.

77. However, Defendant failed to conduct proper testing and engineering analysis during the design, development, and/or testing of the rear underride guard of the Subject Trailer.

78. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

79. If the potential risks, hazards, and/or danger can't be eliminated then they should be guarded against.

80. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, then they should at least be warned about.

81. A company that does not conduct proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously or fatally injure someone is negligent.

82. Based upon information and/or belief, the Subject Trailer's rear underride guard was not subjected to rigorous engineering analysis.

83. Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the Subject Trailer. Defendant is also in possession of what, if any, engineering analysis was performed.

84. However, it is expected that after all these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

85. Lastly, the materials from other models, years, and foreign markets will provide evidence regarding what Defendant knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

86. The foregoing acts and/or omissions, defects, misrepresentations and/or negligence of Defendant was the producing, direct, proximate, and/or legal cause of the fatal injuries to Angienecka Harris and Plaintiffs' damages.

## V. Damages to Plaintiffs

87. As a result of the acts and/or omissions of the Defendant, Plaintiffs have suffered in the past and will in reasonable probability suffer in the future: mental an-

guish, emotional distress, sorrow, grief, depression, loss of consortium, loss of companionship and loss of enjoyment of life as a result of the death of their beloved daughter, Angienecka Harris,.

88.  As a result of the acts and/or omissions of the Defendant, Plaintiffs have become obligated to pay reasonably and necessary funeral and burial expenses as a result of the death of their daughter, Angienecka Harris.

89.  The above and foregoing acts and/or omissions of the Defendant, resulting in the fatal injuries to Angienecka Harris, have caused actual damages to Plaintiffs.

## VI. Prayer

90.  For the reasons presented herein, Plaintiffs pray that Defendant be cited to appear and answer, and that upon a final trial of this cause, Plaintiffs recover judgment against the Defendant for:

   a. actual damages;
   b. prejudgment and post-judgment interest beginning December 13, 2021;
   c. costs of suit; and
   d. all other relief, general and special, to which Plaintiffs are entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

**The TRACY firm**

/s E. Todd Tracy
E. Todd Tracy (Attorney-in-Charge)
State Bar No. 20178650
TTracy@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas 75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiffs**